We have four cases on the calendar this morning. Patent and trademark case from the PTO. Vaccine case from the Court of Federal Claims. And a veteran's case that is submitted only in the briefs and we will therefore not have argument on. First case is Maine Pharma International v. Merck Sharp & Dohme, 2018-1593. Mr. Simelman. Good morning, Your Honors. May it please the Court. I would like to start with claim construction and then move on to the real party and interest issues. In the proceedings below, a panel of the PTAB held for the first time that an indisputably toxic composition with no proven therapeutic value anticipated pharmaceutical composition claims in the 745 patent. We submit, Your Honors, that this decision was based on an unreasonable claim construction and is unsupported by the evidence or by any precedent. Is it the in vivo claim construction that you're concerned about or is it the application to toxic compounds? The toxic compound is what I'm speaking about right now, Your Honor. In reaching its conclusion, the panel disregarded a well-reasoned Markman decision by Chief Judge Stark of the District of Delaware. Judge Stark had construed the claim term pharmaceutical composition reasonably and very broadly to mean a composition suited for pharmaceutical use. The panel below ignored Judge Stark's claim construction, never performed its own claim construction, but worked backwards apparently from its conclusion that the prior art anticipates the 745 patent claims. Look, you've got a composition to an azole antifungal drug with a CMAX claim limitation. And you've got a reference showing administration to dogs and the CMAX limitation is met. And isn't that at least anticipated? No, and in response to Your Honor's question, what the prior art did, and this is the CHI reference, what the prior art did is it administered a dosage of 10 milligrams of this toxic substance, MFB-1041, to dogs that each weighed 10 to 12 kilograms. So the dosage turned out to be approximately 100 milligrams. It did achieve the CMAX and AUC parameters, but it was with a toxic substance and there's no evidence to the contrary. It's a highly toxic substance in two respects. But that's what the claim covers, in toxic or not. If it's toxic, it's not going to be marketed. Obviously, someone has a patent on it and they're trying to enforce it. Whether it's toxic or not, the reference either anticipates it or renders it obvious. Well, there are two responses to that, Your Honor. One has to do with the meaning of the term pharmaceutical composition. And the second has to do with the PK parameters. So I'd like to address each one. On the subject of the PK parameters, as I mentioned a moment ago, because the dogs weighed 10 to 12 kilograms each, and because the dosage administered to the dogs by CHI was 10 milligrams per kilogram of animal weight, that was 100 kilograms. But if one were to then extrapolate that to humans, the average weight of which is 75.5 kilograms, that would mean a dosage of 755 milligrams of product. So I believe, Your Honor, and submit respectfully that it's an apples-to-oranges comparison. But moving beyond that... But that argument seems to assume, again, that the claims are limited to humans, right? Well, yes. And again, Judge Stark had found that the claims are limited to humans. We respectfully submit that because the PK parameters only make sense for humans. The argument you just made wouldn't apply if it included animals as well, right? I'm sorry, Your Honor, I couldn't... Your argument you just made wouldn't apply if it were also to include animals. Well, we maintain that our claims, because of the PK parameters, are specifically identified in humans. I understand that. But isn't my statement correct that the argument that you made about extrapolating from beagles to humans wouldn't apply if the claim covered beagles? If the claim covered beagles, that would be right, Your Honor. But our position certainly is that our claims cover humans because of the PK parameters. But I understand Your Honor's position. But I'd like to bring this back to the pharmaceutical composition piece of the claim, because that is really where the focus is. But even Judge Stark said that his interpretation of pharmaceutical composition did not completely exclude all possibility of toxicity. Well, we're not saying that no toxicity can be tolerated. We're not saying that. And, of course, we're all familiar with chemotherapy and other certain types of drugs which have toxicity. What we are saying is MFB 1041 has toxicity but no therapeutic benefit. No therapeutic benefit. Toxicity is an FDA problem, not a patent problem. But in the context of the claim construction, our position, and it's based, for example, on the Mitsubishi decision by this court, our position is that a pharmaceutical composition has to have some form of established therapeutic benefit. And if you've got a product that's purely toxic and that has no proven therapeutic benefit, and there doesn't seem to be any dispute in this case that MFB 1041 has no proven therapeutic benefit. I thought it did. I thought that was the point that CHI made, that it had proven therapeutic benefit with respect to Beagles. No, Your Honor. No, Your Honor. The CHI study had to do with bioavailability. And the CHI study was to administer this product to the Beagles and determine the PK parameters. There's nothing in the CHI study that talks about the therapeutic benefit. In fact, the Beagles were healthy. That's what the article says. They weren't sick Beagles who were then treated and cured or in some way their condition improved. That's not at all in the article. The CHI article talks about PK parameters. It does not talk about therapeutic benefit whatsoever. You wanted to talk about real potty and interest. You wanted to talk about real potty and interest. Yes, yes. So turning now to the real potty and interest issue, we submit, Your Honor, that the PTAB erred in two significant respects. First of all, as a matter of statute and regulation, we submit the statutes and regulations are unambiguous and do not permit the PTAB to do as it did. And second, equally important, regardless of the first point, the case does not fall within the interest of justice. And I'd like to address each point separately. All I did was update the record to add MCI to Merck. It wasn't that they were changing anything significantly, like indicating that Merck was a subsidiary of Coca-Cola. It was just their parent company and it was updating the record. Well, I understand that we're updating the record in a sense, but the real question is whether the petition that was filed originally was a complete petition or not a complete petition. How were you prejudiced by the late amendment? Well, the prejudice came about because we had to spend all these resources. You got notice that it was filed within a year by somebody who had been sued. What's the prejudice of adding the other person? Well, the prejudice arose from the omission. And the prejudice from the omission was we had to spend a lot of time and resources fighting this battle. We got a lot of resistance. We had to go through discovery. Maybe that's because you wasted your time. And resources. Yes, but maybe that was just bad judgment because all it was was updating with the name of the obviously parent company. It wasn't a different party. But I'd like to put this in the perspective of the American Vents Act. Let's remember, Your Honors, that that statute was enacted in order to provide an alternative pathway for petitioners. And as we all know, the prior regime was different. The act created a structure. And Congress defined what the initial disclosures have to be in the context of availing oneself of the benefits of the act. One of those is a disclosure of all the real parties in interest. And in the regulations that were instituted to implement that statute, in particular, I'm citing section 42.106. I understand that your argument is this is really a 315B time bar question, right? I submit it is a 315B time bar question. And the regulations were recognizing that we're supposed to have all the real parties in interest before we give you a filing date. Yes. So as to be compliant with that time bar. Yes, Your Honor. So assuming all of that is true, what is your argument that the board wouldn't otherwise have had the discretion to allow this late filing at least under the provision that talks about the interests of justice? Well, I think the regulations have to be read in their entirety. And we start with 42.106. It says a petition to institute will not be accorded a filing date absent certain requirements. This petition was accorded a filing date, obviously an error, because the clerk of the PTAB has no way of independently verifying who the real parties are. And the PTAB has regulations that say once a petition is filed, we presume that all the real parties in interest are identified until someone objects. And we have a basis to assume otherwise. And we've endorsed that practice. Yeah, and for two years the PTAB interpreted and applied its own regulations in precisely the way we're describing. The PTAB was very strict throughout 2014-2015. The PTAB was very strict in saying if you did not include your real party in interest in your original filing, it was defective and we will not allow a retroactive cure. Did the PTAB in this case ever conclude that MCI is actually a real party in interest? Or did they just simply allow it to be added without reaching that conclusion? Well, the PTAB stopped short of ever making a factual determination. But ultimately, ultimately, Merck filed an amendment in which they represented that the parent is a real party in interest. It was not filed with any kind of reservation of rights or anything like that. It simply said. Yeah, but they've taken the position that it wasn't a real party in interest before. And the notion that a parent company is sort of invariably the real party in interest of a subsidiary wouldn't be correct, right? Well, we're not claiming that inherently a parent is always going to be a real party in interest. We agree that that's not a principle of law. But we had developed sufficient evidence in our view that in this particular case, it was a real party in interest. Well, they filed not because they agreed with you, but because they wanted to try to avoid controversy about this, right? Well, let's also remember, Your Honor. Isn't that the case? Yeah. Well, that's what they said. Yeah. That's what they said. But let's also bear in mind that this was not a blunder or an omission by a clerk or anything like that. The deposition testimony taken from two in-house attorneys at Merck, including a senior person who was a vice president, that testimony indicated it was a deliberate decision. It was considered, contemplated. But it was deliberate because they didn't think MCI was a real party in interest, or at least that's their explanation. Well, yes and no, Your Honor. They do say that along the way. But in response to the specific question, they invoked legal – they said it's a legal strategy. They invoked privilege. And we're not challenging the invocation of privilege, but at the same time – I think everybody can see this wasn't a clerical error. Yes. It was a conscious decision. And that the only way out of that error for the board or for Merck is the bucket that talks about interest of justice. That's the only possible way out for Merck. And the PTAB below, they invoked interest of justice. They did not explain in any meaningful way why Merck deserved to be awarded an opportunity for a retroactive filing under the interest of justice. And, Your Honors, if I may just add another thought to this. Didn't they determine there was no prejudice? There was a finding of no prejudice, yes, sir. Yes, but that shifted the burden inappropriately to me. It was now up to me to meet its burden of showing prejudice. And where is that in the regulations? It's not. It's not in the regulations. Is it your position that the board could never backdate the petition filing date if to do so would be a violation of 315B? Our position is the only outlet provided in the regulations is 42.104C, which talks about a clerical or typographical error. Well, their position on that point is they say, well, that makes it clear that we always have to backdate in those circumstances, but it doesn't say we can never backdate in other circumstances. Sure. But once the director had promulgated regulations that specifically identify the backdating issue and limited the backdating to clerical or typographical errors, we submit as a matter of regulatory construction that that means what it says. And those are the circumstances. And again, coming back to the two years of decisions by the PTAB, that's how they consistently interpreted their own regulations. Is there an hour deference issue here that to the extent they're interpreting their regulations to say this interest of justice bucket allows them to broaden the circumstances under which they backdate? Well, there's no hour deference issue. Merck has raised it. The solicitor has not. So I think it's very telling that the solicitor who would have been probably the entity to raise our standing has chosen not to do it. So I think that's a very significant point. But beyond that, moving into the merits of hour, we maintain there's no ambiguity here. There's no ambiguity here. The solicitor has not argued in its brief that there is ambiguity. We say there's no ambiguity. What is the unambiguous definition of interest of justice? There's no definition of interest of justice set forth. And I submit, Your Honors, that the court does not need to formulate a definition. I would submit that if the court were to find that a deliberate strategic decision to withhold a real party in interest from the petition somehow meets the interest of justice just because the adversary has not met an invented burden to establish prejudice, that would set a precedent that would create an environment in which every petitioner is now going to decide internally, well, should we disclose the real party in interest or not? Counsel, you have well exceeded all of your time, including your rebuttal. We'll save two minutes of rebuttal time for you. Thank you. Thank you, Your Honors. Counsel, could you pronounce your name for us? Yes, Your Honor. It's Jennifer Sweezy. May it please the court. On behalf of Merck, Sharpe, and Dohm, the petitioner and appellee, unless the court has a preference, I think I'd like to take the issues in reverse order and first start with why the board reasonably exercised its discretion in allowing us to add a real party in interest. I have a couple of points here. First, the board spent a considerable amount of time looking at this. This wasn't a fly-by-night evaluation. It first found that Maine had not presented enough evidence to oppose institution at the institution phase. And then it held two teleconferences and in its final written decision. So it carefully considered this issue. But careful or not, the whole point is that by adding MCI without backdating, there would have been a violation of the statutory time bar for this petition. We disagree with that, Your Honor. Because the statutory time bar under Section 315B, as this court's in-bank decision in Y-5-1 has said, the inquiry is looking at real-world facts. Is there a party that would have been a real party in interest or even a privy, which don't have to be named in petitions for IPR, if there had been such a party that existed at the time the petition was filed, if that is true and that party had been served with a complaint one year before the date of the petition, then the petition suffers the same consequence. But this court made clear in Y-5-1 that the inquiry we're talking about here, whether an RPI is actually named in the petition, is a pleading requirement. And that is fully within the board's discretion to figure out exactly— Obviously, you've got a situation in which the board is permitted to accept the statements on the face of the petition that these are all the real parties in interest. But it can't be the case that, therefore, if that's a completely false statement, the board can just ignore it every time, even if it creates a time bar. I mean, the board's own regulations are pretty logical here. They're saying, OK, we're going to accept it on its face. We'll assess the validity of it after the fact. And the way the regulations work is they say, if we find that someone else should have been the real party in interest, then that's the new filing date. And that's very consistent with 315B. So why are we even talking about that initial look and assumption that all the real parties in interest are accurate? And I don't mean to limit it to the initial look. What the regulations provide the board to do is, in its discretion, determine if the petition is sufficient. And that includes whether the real party in interest have been properly named and if there should be an amendment later. That is expressly permitted under Rule 42.5, and Maine is ignoring that rule. And there's a practical component to this. Here, unlike Wi-Fi, there actually was a filing within the one-year period, right? The issue in Wi-Fi was that there was a filing more than one year. Yeah, so here we have a filing by a real party in interest within the one year. Exactly. Every case this court has confronted where there is a time bar issue, it was because there was a filing beforehand. We don't have that here. So is it your position that this court can never second-guess a real party in interest determination made by the PTAC? No, but not for institution, which is what Maine is trying to do here. It's trying to say that because we didn't ex ante know exactly how the board might come out in an RPI determination, and I'll point out, as counsel acknowledged, the board did not actually reach that issue here. But when you made your finding, you said that they were. You're kind of stuck with that, right? We did it on condition of the non-proton, so we could simply moot this argument that we might somehow be time-barred simply by agreeing to moot the issue and name our parents. Counsel, do you want to address the merits? The claim construction, Your Honor? Yes. Yes, I'm happy to turn to that, and I think the conversation this morning, frankly, resolves the issues there. So on pharmaceutical composition, there was a point that the board did not consider the district court's construction. That's incorrect. At Appendix 91, it clearly acknowledged Judge Stark's decision, but, of course, the board wasn't applying that Phillips standard. It was applying a broadest reasonable construction. Oh, but it would still have to be reasonable. It does. I mean, the district court said it only makes sense for this to have to apply to humans and looked at all the elements of the claim, not just some of the things that were said in the specification, and said, logically, this pharmaceutical composition and the blood parameters that were outlined have to apply to humans, right? No, Your Honor. Frankly, our view is on that construction, that's the wherein in vivo terms. On that construction, the district court was wrong even under its standard, but certainly for the broadest reasonable interpretation, it does reach animals, and that's for two reasons. The claims don't limit themselves to humans, and when you look at the specification, it uses humans once. It's talking about administering, for example, to humans. Well, it defines in vivo as a plant or an animal. Plant is silly. Exactly. But animal is very clear. Exactly, and that's exactly. You jump to my second point, which the claim does recite. Instead of reciting human, it does recite in vivo, and the specification says, we're going to lay out definitions, and our definitions are consistent with the plain and ordinary meaning, and that definition includes plants or animals. What if we were to assume that it is limited to humans? The district court then said, but even if limited to humans, that doesn't prohibit some level of toxicity, right? On that issue, the toxicity issue is a pharmaceutical composition term, and I have a couple of responses on that. The first is that patentability is not the same as FDA, and what Maine is arguing here is an FDA standard. The second point is that what it argued before the board as to what pharmaceutical composition could mean, and this is at Appendix 514 in the paragraph under A, it says, that in its view, CHI could not have been a pharmaceutical composition because it was toxic, and thus not suited for pharmaceutical use. That was its sole argument about pharmaceutical composition toxicity, not this sort of weighing factor, and I will point out that there's another term in the patent, drug, and that is where Maine's made some of these arguments, but it has not pursued or challenged the determination that CHI is a drug. So it's really not a hard leap for a person of ordinary skill understanding that CHI discloses a drug to understand it discloses a pharmaceutical composition and therefore anticipates that term. So you're saying even if limited to humans, the fact that it's purely toxic doesn't change anything? I think the board also found the claims obvious, and so whether limited to humans or whether the sliding scale, the board was also correct in finding the claims obvious. I'm happy to address any other questions on the RPI issue or anything else, but if the court has no questions, I'll submit the remainder of my time. Thank you, Ms. Fusey. Thank you. Mr. Simelman, two minutes, if you need it. Oh, yes, we forgot Ms. Silphans. Patent office has to be heard. You just show up too often. If you don't mind. I just have a couple of quick points that I wanted to make. On the real party and interest question, on the reviewability of it in the first instance, WIFI-1, this court en banc directly addressed the reviewability of questions under 312A2 and drew a line between that and the reviewability of questions under 315A2. But we do have, under the APA, the ability to review the board's application of its own regulations, right? Well, in general, yes, but not when Congress has decided that something is not reviewable. And here, Section 314D says that certain things in the institution question are final and non-appealable. Right, so the question is, because we have the overlay of 315B, whether or not the unreviewability of institution decisions allows the board to ignore its own regulations, even where 315B might otherwise be violated. Well, I would dispute that the regulations are being ignored, but in terms of the preliminary question about reviewability, the court in WIFI-1 at footnote 9 and the text accompanying it specifically addressed the question of when it's a question of 312A2, real party and interest, it's not reviewable, because that is a question not about the real world facts on the ground, like 315B is, but about the sufficiency of the petition itself. But here, the objection that is being lodged is under 315B and the board's regulations, so it might be that it's not really a 315B problem because the petition was otherwise filed in a timely fashion, but that doesn't really pull us into 312. Well, I disagree that it's about a 315B question. There's no dispute that a petition was filed by MSD in a timely manner, and that it would have been timely for even if MCI had filed its own petition separately on that same day, that would have also been timely, and that is precisely the situation that is addressed in WIFI-1 at footnote 9. And it talks about the ELECTA case, and it talks about how it says, if a petition fails to identify all real parties and interests under 312A2, the director can and does allow the petition to add a real party and interest, and that's in the context of a sentence in the text of the opinion talking about how those types of questions are final and non-appealable, even though questions under 315B about the real party and interest and timeliness are reviewable. So you're saying that under the APA, regardless of what the regulations are, we can't review whether or not the board perhaps ignored its own regulations, despite the notice and comment that said this is how it's going to work. In this scenario, that's right, because Congress has specifically said that these things are final and non-appealable, and that overcomes the APA's general preference for review. Now, there are still exceptions, as the Supreme Court in Clozo pointed out, for questions about constitutionality, things like... And mischief, whatever that means, or whatever the term is. Or shenanigans, right. And those sorts of things are reviewable, but the ordinary questions at the institution phase, including the sufficiency of a petition under section 312... Assume that we believe we have jurisdiction, and so that we're looking at the regulations. You agree, I take it, that the only bucket available for the backdating was in the interest of justice. That's right. And how do you define that term? Well, it's not really a question about definitions, I think. I think it's more a question of just applying that. Right, it's a question of, and courts do it all the time, and agencies do it all the time, sort of addressing the facts in the particular case. Which is not an hour question. It's not an hour question, no. It's not a question about ambiguity in the statute, or the regulation. It's a question just about what constitutes an interest of justice, which is something that if it were reviewable, would be reviewed for abuse of discretion. You mean you know it when you see it? It's not you know it when you see it, but it is a sort of equitable type weighing of the facts. It's hard to run away from hour these days. And if the court doesn't have any other questions, I'm happy to sit down. Thank you, Ms. Silfen. Mr. Semelman. Thank you, and I'd like to speak briefly about the reviewability issue. There have been two decisions from this court that, in our view, firmly address and establish reviewability in our context. One is Worlds v. Bungie, the other is Applications and Internet Time v. RPX. And in Worlds v. Bungie, the court stated that under 35 U.S.C. 312a.2, an IPR petition may be considered only if, and I'm skipping some of the wording, the petition identifies all real parties in interest. And the court went on to say correctly identifying all real parties in interest is important as the determination may impact whether a petition may be instituted, and it cites Section 315. So it seems to me that we're well past the point that the solicitor has identified. We are now well within an established set of case law that has determined that a review of a real party in interest determination by the PTAB is reviewable by this court. But none of those cases was like this one where there had been a timely filing within the one-year period, right? Well, in Worlds v. Bungie, there was an omission of an alleged RPI. The court vacated the determination that had been made by the PTAB that the entity identified as a putative RPI was not in fact an RPI. So the facts are not literally identical, but the concepts are what's important here because the court said, obviously this comes on the heels of the quasi-decision by the Supreme Court. The court in Worlds v. Bungie said that it is important to correctly identify a real party in interest. It was not one of these minor technicalities that are of no particular importance to the country. In Worlds v. Bungie, the court said it is important. If I can speak very briefly. Very briefly, as your red light is on. Okay, just one more minute on the claim construction. I just want to leave the court with the following thought. There's a difference between a drug and a pharmaceutical composition. A drug in the sense of, say, a molecule may be toxic. But when formulated in a composition, the toxicity could be mitigated. That could happen. So those are really two distinct concepts that I just want to leave the court with. And in the context of MFP 1041, there is no evidence that an oral dosage of MFP 1041 in any composition has in any way mitigated the toxicity, even putting aside the lack of therapeutic benefit. Thank you, Your Honor. Thank you, counsel. The case is submitted.